UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA BUREAU OF CRIMINAL APPREHENSION & HENNEPIN COUNTY ATTORNEY'S OFFICE,<br><br>     Plaintiffs,<br><br> v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; JOHN CONDON*, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement*; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. Customs and Border Protection; GREGORY BOVINO, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S Immigration and Customs Enforcement*; U.S. Immigration and Customs Enforcement; PAMELA BONDI, *in her official capacity as Attorney General of the United States*; KASHYAP PATEL, *in his official capacity as Director of the Federal Bureau of Investigation*.<br><br>     Defendants. | Case No. _____ |

## MEMORANDUM IN SUPPORT OF TRO

   Plaintiffs the Minnesota Bureau of Criminal Apprehension (BCA) and Hennepin County Attorney's Office (HCAO) move this Court to issue a temporary restraining order

(TRO) preventing the federal Defendants from destroying evidence related to a recent fatal shooting in Minneapolis. Minnesota is a sovereign State that—as a matter of basic federalism—has a constitutional right to investigate a fatal shooting in its largest city. If this Court does not provide immediate emergency relief, recent events suggest Defendants may fail to properly preserve evidence, and the State may permanently lose access to information gathered on the scene.

Events are evolving, but here is what we know: earlier this morning, federal officers shot and killed a man in the area of 26th Street East and Nicollet Avenue in Minneapolis. From initial reports, it appears a victim may have been in the process of being restrained by multiple federal officers immediately prior to the fatal shooting.

As BCA Superintendent Drew Evans details in an accompanying declaration,[1] BCA personnel headed to the scene to investigate the incident, as is typical with officer-involved shootings involving federal agents. Preliminary investigatory measures normally include: establishing a perimeter; preserving the scene; taking photographs and measurements; identifying those involved and witnesses; taking statements; and collecting physical evidence.

Attorneys and other staff from the HCAO also responded and collaborated with investigators throughout the day. The HCAO has jurisdiction to prosecute felonies that occur within Hennepin County, to convene and present to the grand jury, and to seek subpoenas to secure witnesses and evidence for criminal proceedings. Minn. Stats. §

---

[1] The Evans declaration is being filed with this motion for a temporary restraining order.

388.05, subd. 1.  In the case of uses of deadly force by Minnesota peace officers, the law requires that a report of the investigation be submitted to "to the prosecutor for the county in which the incident occurred."  Minn. Stats. § 626.5534, subd. 3(c).  As the prosecuting authority with jurisdiction for any crime that may have occurred, the HCAO works closely with investigators to ensure that evidence is preserved and handled properly.

But federal personnel purported to order BCA personnel to leave.  According to reports, federal personnel may have seized cell phones, taken other evidence from the scene, and detained witnesses.  It is unclear whether federal personnel otherwise processed the scene—let alone how carefully.  Then just a few hours after the shooting, federal personnel left, allowing the perimeter to collapse and potentially spoiling evidence.

From a law enforcement perspective, this is astonishing.  The federal government's actions are a sharp departure from normal best practices and procedure, in which every effort is taken to preserve the scene and the evidence it contains.  Instead, by first attempting to bar BCA and then letting the scene collapse, the federal government appears to have taken measures that directly led to the destruction of evidence.

Now, more than ever, the public needs confidence that this investigation is being handled in a careful, neutral, and professional manner.  Plaintiffs are concerned that—absent this Court's order—Defendants will continue to willfully fail to preserve evidence, including evidence federal officers took from the scene.  If that occurs, Plaintiffs will lose access to that information forever.  Plaintiffs therefore respectfully request this Court order Defendants not to destroy any of the evidence they have collected or will collect in the next 14 days.  This TRO should not be necessary.  But unfortunately, events today suggest this

Court's intervention is essential to preserving the status quo and to protecting the State's sovereign powers to investigate a fatal shooting.

## STANDARD

"[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for preliminary injunction." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). A "court must consider: 1. the threat of irreparable harm to the movant; 2. the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; 3. the probability that movant will succeed on the merits; and 4. the public interest. *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 917-918 (8th Cir. 2025) (quotation marks omitted).

But when considering requests for evidence preservation, many "courts relax the standard so that plaintiffs do not have to demonstrate likelihood of success on the merits of the litigation." *Ingersoll v. Farmland Foods, Inc.*, No. 10-6046-CV-SJ-FJG, 2013 WL 461918, at *2 (W.D. Mo. Feb. 6, 2013) (collecting cases). In this circumstance, courts balance "(1) the level of concern for the maintenance and integrity of the evidence in the absence of a preservation order; (2) any irreparable harm likely to result to the party seeking such order; and (3) the capability of the party to maintain the evidence sought to be preserved." *Id*.

## ARGUMENT

I. **PLAINTIFFS' CONSTITUTIONAL POLICE POWERS ARE THREATENED.**

Although Plaintiffs need not demonstrate likelihood of success to secure an order to preserve evidence, the State of Minnesota, through its agency the BCA, and the HCAO,

have a sovereign right to access information that the federal government may have seized and which directly relates to an investigation of a fatal shooting in Minnesota.

It is well established that suits in equity are available to enjoin certain unconstitutional actions by federal officials, including the clear violation of the Tenth Amendment and principles of federalism at issue in this case. *See, e.g., Raz v. Lee*, 343 F.3d 936, 938 (8th Cir. 2003) (holding that district court erred for refusing to entertain constitutional claim for injunctive relief, and finding sovereign immunity waived for such suits by 5 U.S.C. § 702); *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 43-44 (1st Cir. 2002) (recognizing such a cause of action for constitutional claim by State).

The State of Minnesota and its political subdivisions have both a right and a duty to investigate whether a crime has occurred within their borders—and the associated right to access information necessary to that end. The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution" "are reserved to the States respectively." U.S. Const. amend X. This Amendment, "like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of the national power." *Alden v. Maine*, 527 U.S. 706, 713-714 (1999). It has long been understood to protect the rights of states to exercise their "police powers" within their borders. *See United States v. Morrison*, 529 U.S. 598, 618-619 (2000).

Moreover, it is a basic principle of our federal system that the Constitution "recognizes and preserves the autonomy and independence of the States." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938)) (quoting Justice Stephen Field in *Baltimore & Ohio R. Co. v. Baugh*, 149 U.S. 368, 401 (1893)). The right to enforce criminal law lies at the

heart of this autonomy. As the Supreme Court has explained, "the administration of criminal justice rests with the States except as Congress, acting within the scope of [its] delegated powers, has created offenses against the United States." *Screws v. United States*, 325 U.S. 91, 92 (1945). Indeed, "[t]he Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code." *Heath v. Alabama*, 474 U.S. 82, 93 (1985) (quoting Federalist No. 9); *see also Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law.").

Notably, this case does *not* ask the Court to mediate any clash between the State's rights under the Tenth Amendment and the federal government's own constitutional powers to enforce its law. *See* U.S. Const., Art. VI, cl. 2 (Supremacy Clause). At present, Plaintiffs seek only to preserve and examine evidence. Permitting Plaintiffs to perform that modest task does not conflict with any federal law or interfere with any function exclusively reserved to the United States. *See generally Kansas v. Garcia*, 589 U.S. 191 (2020) (holding that a state's prosecution of noncitizen for identity theft did not interfere with the federal government's enforcement of federal laws).

Accordingly, Plaintiffs are likely to prevail on their claim that they have a core sovereign right, at a minimum, to the preservation of, and access to, evidence relevant to a state criminal investigation into a shooting of a State resident within their borders.

## II.     THE REMAINING FACTORS MERIT RELIEF.

*First*, without a temporary restraining order, Plaintiffs will suffer irreparable harm by forever losing access to evidence in the federal government's custody that the federal government may otherwise destroy. *See SEC v. Bivona*, No. 16-CV-01386-EMC, 2016 WL 2996903, at *2 (N.D. Cal. May 25, 2016) (issuing injunction to prevent harm of "evidence being destroyed or concealed").

What happened today was not normal, and it suggests that the federal government may fail to preserve information that will be critical to a thorough investigation. The federal government took actions that obstructed the BCA's investigation and may have failed to protect and secure evidence at the crime scene. The integrity of the scene following a homicide is paramount to the search for the truth of what caused the loss of human life. But the federal government purported to order BCA from accessing a public street in Minneapolis to process evidence. Then the federal government abruptly departed the street, allowing the perimeter to collapse and likely leading to the spoilation of the scene. This astonishing series of events indicates that the federal government may continue to withhold—and fail to protect—evidence in derogation of Minnesota's solemn prerogative to protect the public trust. *See Heath* 474 U.S. at 89 (1985) (explain that "each State's power to prosecute is derived from its own 'inherent sovereignty'").

*Second*, Plaintiffs' irreparable harm is so weighty that any harm to the federal government does not even budge the scales. But in fact, the TRO would cause no cognizable harm to the federal government. A TRO does not interfere with the federal government's ability to conduct its own investigation. Instead, it simply requires the

federal government to preserve the status quo for a brief period so that a separate sovereign may conduct its own investigation.

*Third*, the public interest strongly favors a TRO. There is no public interest in the federal government destroying evidence or obstructing the State's police powers. Meanwhile, the public interest is served by a fulsome investigation. Indeed, at minimum, a TRO is critical to preserving the status quo and allowing any litigation to proceed.

## CONCLUSION

For the foregoing reasons, the Court should issue the proposed TRO.

Dated: January 24, 2026          Respectfully submitted,


KEITH ELLISON
Attorney General
State of Minnesota


/s/ **Pete Farrell**
PETER J. FARRELL (#0393071)
Deputy Solicitor General
JOSEPH RICHIE (##400615)
Special Counsel

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
Peter.Farrell@ag.state.mn.us
Joseph.Richie@ag.state.mn.us

*Attorneys for Plaintiff Minnesota Bureau of Criminal Apprehension*

MARY F. MORIARTY
Hennepin County Attorney

/s/ **Clare A. Diegel**
Clare A. Diegel (#400758)
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-5550
clare.diegel@hennepin.us

*Attorney for Plaintiff Hennepin County Attorney's Office*

-9-