# Exhibit F

Just Security – JustSecurity.org

# What a Proper Investigation of Alex Pretti's Killing Would Look Like

By Julia Gegenheimer

Published on January 24, 2026

On Saturday morning shortly after 9am local time, U.S. Border Patrol agents shot and killed Alex Pretti, a 37-year-old I.C.U. nurse, on the streets of Minneapolis. The facts are still emerging. But there are strong early indications that federal authorities are again rushing to ultimate conclusions and are not taking the usual and appropriate steps to conduct a careful and thorough investigation.

Saturday morning's killing was the second fatal shooting, and the third shooting overall, by federal immigration agents in Minneapolis in just over two weeks. Publicly available bystander videos from multiple angles appear to show several agents stopping two people on the street and spraying one of them, Pretti, with a chemical agent. At the time, Pretti's hands were visible and holding up a cellphone. The videos then show agents wrestling Pretti to the ground, where they struggle with and repeatedly strike him. At no point does Pretti appear to brandish a firearm. At one point during the scuffle, an agent can be seen approaching the group empty-handed, brushing up the back of Pretti's shirt, and walking away with an apparent firearm in his hand. Shortly thereafter, and while Pretti is still surrounded by agents, another agent pulls out his firearm. Apparently two agents discharged their weapons. One agent shoots as Pretti appears to push up toward standing. Four or five shots can be heard as Pretti falls, with more fired as he lay on the ground. Ten shots were apparently fired in total. Pretti died shortly after.

(Bellingcat and the New York Times have produced the most complete coverage to date of these events.)

Federal officials are already offering their views on some of the ultimate issues here – including the agents' intent and Pretti's motivations– but what is required is the same as for the shooting of Renee Good: a careful investigation to determine if the agents' use of deadly force was warranted or in violation of the law. Yet fewer than three hours after the shooting, DHS stated via social media that the agent had "fired defensive shots" out of "fear[] for his life and the lives and safety of fellow officers." DHS suggested that Pretti had initiated the violent confrontation by "approach[ing] US Border Patrol officers with a 9 mm semi-automatic handgun," and described the incident as "a situation where an individual wanted to do maximum damage and massacre law enforcement." Included with the statement was a photo of a handgun apparently belonging to Pretti, positioned on the seat of a vehicle.

## Questions for Investigation

If true that Pretti threatened agents with a firearm, the investigation could potentially show that one or both agents' actions were not in violation of the law. (Such a showing will be more difficult for any agent who fired shots after Pretti lay motionless on the ground.) So, specific facts related to this firearm are significant. From the standpoint of a federal criminal civil rights violation, such facts bear on whether an agent's use of deadly force was excessive and on the agent's intent.  On the first question: an agent's force will be justified only if it was objectively reasonable under the circumstances present and known at the time. That means information discovered only after the fact can't be used to retroactively justify the force. Whether Pretti brandished a gun at the agents, and whether agents were able to disarm him or secure his hands before the shooting, bears directly on the question of imminent risk of harm to the agents and the objective reasonableness of the deadly force used here. Similarly, on the issue of intent: a gun clearly brandished at the agents would corroborate claims of self-defense; what's more, a good-faith defense could be supported by evidence that the agents who shot Pretti did not realize he had already been disarmed. Conversely, any efforts to justify the shooting based on a firearm that had already been confiscated or did not play a role in the scuffle could suggest the agents' consciousness of wrongdoing.

## Procedural Steps

The possible impact of these details highlights the need for careful fact-gathering and assessment through an unbiased investigation. In the wake of any homicide (which is indisputably what this is), investigators should immediately secure the crime scene and preserve the evidence in it. That entails painstakingly photographing and documenting every item of potential relevance—where it was located, how it was positioned, what was its condition. It involves constructing a precise chain of custody for all physical evidence, to counter any suggestion that items were tampered with or altered. And it involves preserving all forensic evidence, including DNA and fingerprints, for possible later testing. Witnesses are also identified and asked to provide voluntary statements. Overall, these careful steps help ensure that the conclusions of an investigation—either finding wrongdoing or that the shooting was justified—are not undermined by allegations that the investigation was either too careless or cursory to be reliable, or that it didn't happen at all.

The photo DHS posted of the firearm suggests possible missteps in how the federal government appears to have handled the crime scene. The firearm's location directly bears on whether the agent's force was excessive and intentional. Assuming the gun was not found on the seat of that car, it had been moved before being photographed. Perhaps an agent disarmed Pretti and immediately placed it on the car seat to photograph. Even if its precise location and condition on the scene had been documented earlier, by the time of the photograph the gun had not been placed in an evidence bag, labeled, or stored securely. Without additional documentation, the photo raises serious questions about the reliability of any later ballistics or forensic testing on that item.

Furthermore, despite best practices, DHS reportedly tried to keep away from the area state and local law enforcement—officers presumably better experienced and equipped than federal immigration officials in how to safely and efficiently process a crime scene. Federal agents also reportedly detained and transported several bystanders (potential witnesses) to the Whipple Federal Building, a federal courthouse, office space, and detention center near the Minneapolis airport. That action is concerning but also one in which more information is likely to be reported soon. It is worth noting that an individual's refusal to provide a voluntary account of the incident is not, on its own, grounds for an arrest.

What is known publicly about this most recent shooting is so rapidly evolving that any definitive conclusion is not possible at this stage. But at the very least, the publicly available video evidence and apparent irregularities in how agents have treated the crime scene seriously call into question DHS's early characterizations of the incident. The situation requires an independent and careful investigation by law enforcement authorities.

*FEATURED IMAGE: MINNEAPOLIS, MINNESOTA - JANUARY 24: People look on near the site where 37-year-old Alex Pretti was allegedly shot and killed by federal agents on January 24, 2026 in Minneapolis, Minnesota. Federal agents allegedly shot and killed Pretti, a south Minneapolis resident, amid a scuffle to arrest him. The Trump administration has sent a reported 3,000 federal agents into the area, with more on the way, as they make a push to arrest undocumented immigrants in the region. (Photo by Stephen Maturen/Getty Images)*