UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Minnesota Bureau of Criminal
Apprehension and Hennepin County
Attorney's Office,

   Plaintiffs,

v.

Kristi Noem, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; John Condon, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; U.S. Department of Homeland Security; Todd Lyons, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; Marcos Charles, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*; U.S. Immigration and Customs Enforcement; Rodney Scott, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; U.S. Customs and Border Protection; Gregory Bovino, *in his official capacity as Commander of the U.S. Border Patrol*; U.S. Border Patrol; David Easterwood, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*; Pamela Bondi, *in her official capacity as Attorney General of the United States*; and Kashyap Patel, *in his official capacity as Director of the Federal Bureau of Investigation*,

   Defendants.

File No. 26-cv-628 (ECT/DTS)

**OPINION AND ORDER**

Peter J. Farrell and Joseph Robert Richie, Minnesota Attorney General's Office, St. Paul, MN, for Plaintiff Minnesota Bureau of Criminal Apprehension.

Clare A. Diegel, Hennepin County Attorney's Office, Minneapolis, MN, for Plaintiff Hennepin County Attorney's Office.

Friedrich A.P. Siekert, United States Attorney's Office, Minneapolis, MN; and Andrew I. Warden, U.S. Department of Justice, Washington, D.C., for Defendants Kristi Noem, John Condon, U.S. Department of Homeland Security, Todd Lyons, Marcos Charles, U.S. Immigration and Customs Enforcement, Rodney Scott, U.S. Customs and Border Protection, Gregory Bovino, U.S. Border Patrol, David Easterwood, Pamela Bondi, and Kashyap Patel.

Federal officers shot and killed Alex Pretti on January 24, a little more than one week ago. Federal agents collected evidence from the scene. The federal agencies sued as Defendants in this case possess that evidence. They won't share it with the Minnesota Bureau of Criminal Apprehension ("BCA") or the Hennepin County Attorney's Office.

The BCA and the Hennepin County Attorney's Office brought this case to obtain access to the evidence Defendants possess. They filed the case the day of the shooting, and they sought and received a temporary restraining order enjoining Defendants from destroying or altering evidence related to the shooting.

By law, the temporary restraining order expires no more than fourteen days after its entry. Fed. R. Civ. P. 65(b)(2). The issue is whether to dissolve the order, extend it, or convert it to a preliminary injunction. I conclude the better answer is to dissolve it. Though the record is not one-sided, the greater weight of the evidence shows Defendants are not likely to destroy or improperly alter evidence related to Mr. Pretti's shooting during the life of this case, and other relevant considerations do not on balance favor a continuing preservation order.

This order proceeds in five parts: (1) It recounts Plaintiffs' factual allegations and the evidence they offered to support their motion for a temporary restraining order. (2) It summarizes Plaintiffs' claims and legal theories. (3) It describes the case's procedural history. (4) It reviews the law governing a federal court's consideration of a request for temporary injunctive relief in the evidence-preservation context. (5) And it applies that law to Plaintiffs' allegations and evidence and the record developed after the temporary restraining order's issuance.

*Plaintiffs' Factual Allegations and Evidence*

Mr. Pretti's shooting occurred "in the area of 26th Street East and Nicollet Avenue in Minneapolis." Compl. [ECF No. 1] ¶ 2. The federal officers who shot and killed Mr. Pretti were in Minneapolis as part of "Operation Metro Surge." *Id.*

Soon after the shooting, BCA personnel traveled to the scene to investigate. *Id.* ¶ 3. As BCA Superintendent Drew Evans explained in a sworn declaration, "[w]hen a law enforcement officer uses force and a person dies or is seriously injured in the State of Minnesota, agents with the BCA's Force Investigations Unit investigate the officer's actions to determine the circumstances of the incident." Evans Decl. [ECF No. 5] ¶ 2. The unit's activities include investigating the use of force by federal officers. *Id.* ¶ 6. Historically, the BCA has investigated federal officers "without federal involvement" or "in cooperation with the Federal Bureau of Investigation[]" (or "FBI"). *Id.* The BCA's preliminary on-scene investigative activities ordinarily include "establishing a perimeter; preserving the scene; taking photographs and measurements; identifying those involved and witnesses; taking statements; and collecting physical evidence." Compl. ¶ 3.

3

After BCA agents arrived, federal agents blocked them from accessing the scene. *Id.* ¶ 4; Evans Decl. ¶ 13. Though BCA personnel continued to ask Department of Homeland Security (or "DHS") officials for access to the scene, "DHS did not respond." Evans Decl. ¶ 14. In response to federal agents' refusal to allow it access to the scene, the BCA sought and secured a search warrant signed by a Hennepin County District Court Judge. *Id.* ¶ 15; *see id.* Ex. A [ECF No. 5-1]. The warrant was signed just before noon on January 24. Evans Decl. ¶ 15; *see id.* Ex. A at 7.[1] BCA agents returned to the scene and presented the search warrant to federal agents. Evans Decl. ¶ 17. As far as the federal agents were concerned, the warrant didn't make a difference. They "once again blocked the BCA agents and crime scene personnel from accessing the scene." *Id.* ¶ 18.

Federal personnel gathered evidence from the scene. They "seized cell phones" and interviewed witnesses. Compl. ¶ 5. And federal agents retained possession of a firearm allegedly taken from Mr. Pretti. *See* Evans Decl. ¶ 25. Within "a few hours after the shooting," federal agents departed the scene, "allowing the perimeter to collapse and potentially spoiling evidence." Compl. ¶ 6.

*Plaintiffs' Legal Theories and Requested Relief*

Plaintiffs' overarching contention is that they have a constitutional right to access the evidence Defendants possess. Access is essential, Plaintiffs contend, "to carry out their sovereign right and responsibility to investigate possible violations of state law" occurring in Minnesota. Compl. ¶ 1.

---

[1] Page citations are to pagination assigned by the court's CM/ECF system, appearing in a document's upper right corner, not to a document's original pagination.

Plaintiffs assert four claims to vindicate this alleged right. These are: (1) A direct claim under the federal Constitution's Tenth Amendment and broader constitutional federalism principles on the theory that Defendants' refusal to grant Plaintiffs access to the evidence in Defendants' possession would "violate[] Plaintiffs' core sovereign interests in investigating and enforcing state criminal law." Compl. ¶¶ 34–41 (Count I). (2) A claim that Plaintiffs possess "a non-statutory right of action in equity" to pursue their Tenth Amendment and federalism-based theories. *Id.* ¶¶ 42–44 (Count II). (3) A claim under the Administrative Procedures Act (or "APA"), 5 U.S.C. § 706(2), on the theory that Defendants' denial of Plaintiffs' access to evidence relating to Mr. Pretti's shooting is judicially reviewable final agency action that is arbitrary, capricious, and not in accordance with law. *Id.* ¶¶ 45–49 (Count III). (4) A claim under the APA, 5 U.S.C. § 706(1), on the theory that "[b]y refusing to provide Plaintiffs with access to evidence related to the shooting, which is urgently needed for Plaintiffs to discharge their duties and carry [out] core state police powers, Defendants have unlawfully withheld and unreasonably delayed agency action." *Id.* ¶¶ 50–51 (Count IV).

Plaintiffs seek declaratory and injunctive relief. They request a declaration that the denial of access to the evidence in Defendants' possession related to Mr. Pretti's fatal shooting "is unconstitutional and unlawful." *Id.* at 10. And they request preliminary and permanent injunctions that would, if issued, prohibit Defendants "from destroying, altering, or concealing any such evidence" and "from continuing to deny Plaintiffs access to any such evidence." *Id.* In addition to forward-looking declaratory and injunctive relief,

5

Plaintiffs seek an award of attorneys' fees and costs and "such other and further relief as this Court deems just and proper." *Id.*

*This Case's Procedural History*

Things in this case have moved quickly. As noted, Plaintiffs filed the case on January 24, the same day Mr. Pretti was killed. *See* Compl. Alongside their Complaint, Plaintiffs sought a temporary restraining order to enjoin Defendants "from destroying or altering any and all evidence related to [Mr. Pretti's] shooting . . . , including but not limited to any evidence (or potential evidence) taken from the scene of the shooting and any evidence (or potential evidence) that Defendants are holding in exclusive federal custody." ECF No. 2 at 3. To support their temporary-restraining-order motion, Plaintiffs filed a brief and the declaration of BCA Superintendent Evans. ECF Nos. 4, 5.

I granted Plaintiffs' motion and issued the requested temporary restraining order, also on January 24, at around 11:00 p.m. ECF No. 10. As I saw things then, Plaintiffs' brief and Superintendent Evans's declaration showed—or at least justified the inference—that evidence related to Mr. Pretti's shooting had already been spoliated. Superintendent Evans testified that federal officers did not maintain the scene of Mr. Pretti's shooting and that it was "overrun by individuals in the area." Evans Decl. ¶ 20. From this testimony, I inferred that federal officers left themselves with insufficient time to complete customary investigative procedures at the scene, meaning some evidence was left behind and compromised. Superintendent Evans also testified that federal officers did not undertake customary evidence-preservation procedures regarding a firearm allegedly taken from Mr. Pretti. *Id.* ¶ 25. From this evidence showing at least that federal officers had not prevented

6

spoliation from occurring and based on their refusal to cooperate at all with state officers, I inferred that there remained an ongoing risk of spoliation sufficient to justify the entry of an ex parte preservation order.

Like temporary restraining orders generally, the order was intended to be short-lived. Defendants were invited to file a response and objections to the order's entry by noon on Monday, January 26, and a hearing was scheduled for 2:00 p.m. that same day to give the parties the chance to be heard regarding whether the order should remain in effect. ECF No. 10 ¶¶ 3, 4; *see* Fed. R. Civ. P. 65(b)(3). That hearing occurred, and the parties agree that the issue—whether the temporary restraining order should be dissolved, extended, or converted to a preliminary injunction—appropriately may be decided on the current record.

*The Applicable Law*

Three sets of legal rules govern this decision. First are the rules governing the issuance of temporary or preliminary injunctive relief generally. A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 878–89 (D. Minn. 2021) (quoting *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956

7

(D. Minn. 1999) (citation omitted)). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

Second are rules governing the issuance of evidence-preservation orders specifically. A preservation order represents a particular category of injunctive relief. *See Pepsi-Cola Bottling Co. of Olean v. Cargill, Inc.*, Civ. No. 3-95-784, 1995 WL 783610, at *3 (D. Minn. Oct. 20, 1995). Some federal courts "wholesale adopt" the *Winter*/*Dataphase* factors in deciding whether to issue a preservation order. *Buergofol GmbH v. Omega Liner Co.*, No. 4:22-CV-04112, 2024 WL 4882205, at *1 (D.S.D. Nov. 25, 2024). But a majority "relax the standard so that the moving party does not have to demonstrate likelihood of success on the merits of the litigation," on the theory that the case's merits are disconnected from whether an evidence-preservation order might be justified. *Id.* (citation modified) (quoting *Ingersoll v. Farmland Foods, Inc.*, No. 10-6046-CV, 2013 WL 461918, at *2 (W.D. Mo. Feb. 6, 2013)).[2] These courts "slightly adapt" the remaining *Dataphase* factors, *id.* at *1, and consider:

---

[2]    As the court explained in *Toussie v. Allstate Insurance Co.*, an evidence-preservation order "'concerns matters within the scope of the rules of discovery,' and does not reach the substantive merits of any party's claim or defense." No. 15 CV 5235, 2018 WL 2766140, at *5 (E.D.N.Y. June 8, 2018), *aff'd*, 2018 WL 11451597 (E.D.N.Y. Aug. 15, 2018) (citation modified). When deciding whether to issue a preservation order, the court reasoned, "there is no reason to consider whether a party is likely to be successful on

> (1) "the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence"; (2) "any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation"; and (3) "the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation."

*City of Wyoming v. Procter & Gamble Co.*, No. 15-cv-2101 (JRT/TNL), 2016 WL 6908110, at *2 (D. Minn. Oct. 7, 2016) (quoting *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433–34 (W.D. Pa. 2004)); *accord, e.g.*, *Buergofol GmbH*, 2024 WL 4882205, at *1; *Riego v. Carroll*, Civ. No. 08-433, 2009 WL 3448850, at *2 (D. Del. Oct. 23, 2009); *United States v. Corbett*, No. 2:19-cr-107, 2020 WL 6318434, at *2 (E.D. Cal. Oct. 28, 2020); *Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.*, No. 10-62411-CIV, 2011 WL 13096972, at *2 (S.D. Fla. Dec. 30, 2011).[3]

Third is a rule—the "presumption of regularity"—requiring courts to presume that public officials have (and will continue to) properly discharge their responsibilities. *McDonough v. Anoka County*, 799 F.3d 931, 948 (8th Cir. 2015) (quotation omitted); *see*

---

the merits of its case in deciding whether to protect evidence from destruction. Such an approach would be decidedly to put the cart before the horse." *Id.* (citation modified).

[3]  Some courts outside the Eighth Circuit have applied a test that "that requires the party seeking the entry of a preservation order to show that the order is both necessary and not unduly burdensome." *EOX Tech. Sols. v. Galasso*, No. 23-CV-60448, 2023 WL 3478445, at *1 (S.D. Fla. May 16, 2023); *accord Buergofol GmbH*, 2024 WL 4882205, at *1 n.1. However, "both tests appear to account for similar considerations." *EOX Tech. Sols.*, 2023 WL 3478445, at *1 & n.1 (citing *Robinson v. Gielow*, No. 3:14cv223, 2015 WL 4459880, at *3 (N.D. Fla. July 21, 2015)).

*United States v. Armstrong,* 517 U.S. 456, 464 (1996). The presumption may be rebutted with "clear evidence" showing that public officials have not acted properly. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *see Brewer v. United States*, 353 F.2d 260, 263 (8th Cir. 1965) ("Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties." (quotation omitted)); *United States v. Williams*, 544 F.2d 1389, 1391 (8th Cir. 1976) ("[A]bsent any evidence to the contrary there is a presumption of regularity which presumes that public officers have properly discharged their duties and have not tampered with the evidence."); *United States v. Eklund*, 733 F.2d 1287, 1294 (8th Cir. 1984).

*Applying the Law to the Record*

Plaintiffs identify reasonable concerns regarding Defendants' ability and willingness to preserve and maintain the integrity of the evidence in their possession related to Mr. Pretti's shooting, but in my judgment, the record as it stands today largely addresses these concerns and does not justify a continuing preservation order.

1. Defendants maintain evidence-preservation policies, and no evidence shows that these policies are deficient or that Defendants are failing to comply with them. Begin with the policies themselves. The Special Agent in Charge of the St. Paul Office of Homeland Security Investigations ("HSI"), Mark M. Zito, testified that evidence in HSI's possession is subject to preservation requirements imposed by the Federal Records Act, 44 U.S.C.

10

§ 3101 *et seq.*, and agency policies. Zito Decl. [ECF No. 15-1] ¶¶ 10, 14. He explained that these policies require the "documentation of seizure and chain of custody for evidence, as well as the transfer of custody of seized property/evidence," and that "[a]ll seized evidence must be retained until the completion of all trial, appellate, or other judicial proceedings, or if the defendant becomes a fugitive prior to the adjudication of the case." *Id.* ¶ 14. Special Agent in Charge Zito also testified that ICE and HSI agents are trained in proper evidence-preservation procedures, *id.* ¶¶ 10, 13, and that "HSI agents tasked with this investigation are required to preserve all evidence collected, including physical evidence collected by other federal agencies," *id.* ¶ 11.[4] A U.S. Customs and Border Protection (or "CBP") official testified specifically regarding its preservation policy for body-worn-camera data. Jeffrey R. Egerton is the acting Executive Director for the Investigative Operations Directorate, within CBP's Office of Professional Responsibility. Egerton Decl. [ECF No. 15-2] ¶ 2. He testified that "[t]he body worn camera footage for the involved CBP law enforcement personnel is preserved." *Id.* ¶ 12. And he testified that, under CBP policy, body-worn-camera data that "may have any bearing on any criminal, administrative, civil or other legal proceeding must be preserved for 75 years." *Id.* Finally, an FBI agent who currently oversees the FBI's Minneapolis Evidence Response Team

---

[4] Special Agent in Charge Zito testified that "HSI is the lead investigatory entity reviewing the use-of-force encounter at issue in this case." Zito Decl. ¶ 11. News media have since widely reported that the FBI is leading the investigation. *See, e.g.*, Sadie Gurman & Mariah Timms, *Trump Administration Expands Investigation of Pretti Killing*, Wall St. J., Jan. 30, 2026 ("The FBI is leading an investigation into whether federal agents who fatally shot Alex Pretti in Minneapolis violated his civil rights, a top Justice Department official said Friday, expanding what had been a more limited probe after public outcry.").

testified that members of this team responded and collected evidence related to Mr. Pretti's shooting, and that pursuant to FBI policies, the evidence is preserved and "[i]n no event will any collected evidence be destroyed before resolution of this investigation." FBI Decl. [ECF No. 15-3] ¶¶ 3, 5, 6. Again, Plaintiffs have not shown that these policies are deficient, and there is no evidence suggesting Defendants are not complying with them today.

2. Plaintiffs identified significant concerns regarding Defendants' on-scene investigation, but on this record, I find that these concerns over past conduct do not hold substantial predictive value regarding Defendants' ongoing evidence-preservation practices. To recap, BCA Superintendent Evans testified, and the Complaint alleges, that federal officers' refusal to cooperate with state officials and their abrupt departure from the scene left local and state officers unable to maintain the scene's integrity and to conduct their own contemporaneous on-scene investigation. Evans Decl. ¶ 20; Compl. ¶ 6. This testimony justified the inferences that federal officers left themselves with insufficient time to complete customary on-scene investigative procedures and that some evidence was left behind and compromised. In one sense, the FBI representative's declaration testimony reinforces these inferences. The FBI representative testified that FBI officers were unable to adhere to their ordinary evidence-gathering procedures "due to the scene becoming volatile," and that the FBI's evidence-gathering process was truncated "for the safety of personnel." FBI Decl. ¶ 4. In other, more important senses, Defendants' on-scene investigative actions do not justify a continuing preservation order. The federal officers' abbreviated on-scene investigation seems best understood as resulting, not from anything investigating officers did or did not do, but from a volatile situation and reasonable safety

12

concerns. Plaintiffs do not suggest or identify evidence showing Defendants are to blame for failing to prevent the scene from being overrun. In other words, though it appears likely that evidence was lost or spoliated at the scene of Mr. Pretti's shooting, the record here shows the loss or spoliation more likely resulted from exigent circumstances, not from Defendants' substandard evidence-gathering or preservation activities.

      3. Plaintiffs also identified concerns regarding Defendants' post-incident handling of the firearm allegedly taken from Mr. Pretti, and while I share Plaintiffs' concerns at a high level, they remain undeveloped and non-specific. Recall that, in his declaration, Superintendent Evans testified he had "seen images circulating on social media of the alleged gun" taken from Mr. Pretti. Evans Decl. ¶ 25. Superintendent Evans explained: "It does not appear that the gun was protected according to normal law enforcement processes, and I am concerned about other evidence not being protected." *Id.* Defendants did not address this issue in their submissions. Special Agent in Charge Zito testified only that the FBI collected the firearm, which belonged to Mr. Pretti. Zito Decl. ¶ 12. Neither he nor any other witness addressed the firearm's ongoing preservation or disagreed with Superintendent Evans's testimony. *See id.*; Egerton Decl.; FBI Decl. Nor did Defendants address the issue in their brief. *See* ECF No. 14. From Defendants' silence, I infer they failed to safeguard the firearm in compliance with "normal law enforcement processes," as Superintendent Evans testified. Evans Decl. ¶ 25. The problem in deciding what weight to give this troubling fact is that Plaintiffs' concerns are described only generally. We are not told, for example, what normal law enforcement processes would have required, how precisely those were not followed here, whether remedial measures might be available, and

how Defendants' failure to adhere to normal processes might (or might not) compromise an investigation into Mr. Pretti's shooting.  Without knowing more, it is difficult to determine whether Defendants' mishandling of the firearm might show that further spoliation or other evidence-preservation misbehaviors are likely.  Because Plaintiffs bear the burden to show a preservation order should be issued, and because they do not seek a preservation order directed specifically to Defendants' preservation of this firearm, I conclude that Plaintiffs' concerns do not weigh substantially in favor of a broader preservation order.

    4. Plaintiffs filed evidence of public statements made by federal executive-branch officials and the Department of Homeland Security, ECF No. 21, whose ICE/HSI branch was tasked initially with the federal investigation into Mr. Pretti's shooting, Zito Decl. ¶ 11.  In Plaintiffs' view, these statements show that these officials and the Department of Homeland Security decided the day Mr. Pretti was killed that the federal officers who shot him did nothing wrong.  For example, Stephen Miller, White House Deputy Chief of Staff for Policy and Homeland Security Advisor, described Mr. Pretti in a January 24 X post as a "domestic terrorist [who] tried to assassinate federal law enforcement."  ECF No. 21 ¶ 2; ECF No. 21-1 at 2.  That same day, the Department of Homeland Security posted on its X account that the incident "looks like a situation where an individual wanted to do maximum damage and massacre law enforcement."  ECF No. 21 ¶ 3; ECF No. 21-2 at 2.  Kristi Noem, Secretary of Homeland Security, was reported to have said essentially the same thing.  ECF No. 21 ¶ 5; ECF No. 21-4 at 4.  These statements are troubling.  They reflect, not a genuine interest in learning the truth, but snap judgments informed by speculation and motivated

14

by political partisanship. To make a difference here, however, Plaintiffs must show the statements are probative of Defendants' intent to destroy or spoliate evidence related to the investigation of Mr. Pretti's shooting. I conclude that connection is too remote for the statements to justify an ongoing preservation order. No evidence or information suggested Deputy Chief of Staff Miller or Secretary Noem would have been directly involved in the investigation when HSI was leading it, much more that either of them would have been responsible for the destruction or spoliation of evidence. On this record, those conclusions would depend on speculation. Regardless, as noted, it has been widely reported that the FBI is now leading the investigation, further removing these officials from involvement in it. The statements and reporting Plaintiffs cite do not justify the continuing relief they seek.

   5. Other considerations dampen my level of concern regarding the continuing existence and ongoing integrity of the evidence in Defendants' possession. Putting this case aside, Mr. Pretti's shooting alone almost certainly triggered Defendants' duty to preserve evidence that may be relevant to any excessive-force civil suit or proceeding brought on his or his survivors' behalf, and in that proceeding, non-preservation or spoliation would pose significant, perhaps dispositive consequences. *See Valspar Corp. v. Millenium Inorganic Chems., Inc.*, No. 13-cv-3214 (ADM/LIB), 2016 WL 6902459, at *4 (D. Minn. Jan. 20, 2016) (describing preservation obligations generally); *see also Lewis v. McLean*, 864 F.3d 556, 565 (7th Cir. 2017) (directing district court to consider reopening discovery to permit investigation of non-preserved video recording relevant to § 1983 deliberate-indifference claim). And Defendants' declarations show that Defendants

implemented reasonably prompt measures to comply with the temporary restraining order. Zito Decl. ¶¶ 6–7; Egerton Decl. ¶ 7.

6. If I'm correct that Defendants are not likely to spoliate or destroy evidence related to Mr. Pretti's shooting, it follows that Plaintiffs are not likely to suffer irreparable harm caused by spoliation or destruction. If I'm wrong about that and spoliation is assumed, irreparable harm seems likely, but it is not certain. There is a threshold causation issue. If federal officials continue to refuse to cooperate with state officials, and if this case represents Plaintiffs' only way to access the evidence but they do not prevail, then Plaintiffs' lack of access to the evidence Defendants possess would result from their failure to succeed on the merits. Were Plaintiffs given access to the evidence in Defendants' possession, then it seems reasonable to forecast that the spoliation or loss of *any* evidence likely would pose irreparable harm to Plaintiffs' investigation of the incident. Regardless, accounting for all these considerations, the potential harms associated with the possibility of spoliation or destruction do not weigh so heavily as to independently justify a continuing preservation order.

7. Plaintiffs question Defendants' ability to preserve evidence, but they have not shown Defendants are incapable of "maintain[ing] the evidence sought to be preserved." *City of Wyoming*, 2016 WL 6908110, at *2. The closer question is the extent to which an ongoing preservation order would burden Defendants. *Id.* On this question, relevant considerations point in both directions. Favoring Plaintiffs, the temporary restraining order's terms are not meaningfully different from Defendants' preservation policies. That seems obvious. On the other hand, an ongoing preservation order—and the contempt

power that accompanies it—would overlay, not just Defendants' preservation polices, but any investigative measures that might alter evidence. Examination and testing often leave evidence in a different condition after testing than it was before. Legitimate concerns over whether those types of investigative measures comply with a preservation order might reasonably prompt Defendants to seek judicial direction. That, in turn, would inject the court into Defendants' investigation, not just their evidence preservation. Burden considerations do not favor either side.

8. Some items that have not yet been addressed deserve a brief explanation. (a) The absence of any discussion regarding the merits of Plaintiffs' substantive claims is deliberate. In the preservation-order context, it makes better sense to instead consider the likelihood of non-preservation or spoliation. (b) In this case's unique circumstances, I conclude that the public-interest factor is subsumed within the analysis of the likelihood of spoliation and irreparable harm. (c) This order assumes that Plaintiffs rebutted the "presumption of regularity" that ordinarily attends public officials' actions. *Brewer*, 353 F.2d at 263. (d) Because this order has the effect of denying preliminary injunctive relief, judgment will be entered.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. The Temporary Restraining Order dated January 24, 2026 [ECF No. 10] is **DISSOLVED**.

2. To the extent Plaintiffs seek further relief through their Motion for a Temporary Restraining Order [ECF No. 2], Plaintiffs' request is **DENIED**. This denial is without prejudice to any future motion Plaintiffs may file should they believe circumstances have changed or narrower relief is required.

3. Defendants' Motion to Seal FBI Declaration [ECF No. 18] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 2, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court